IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 16-cv-02786-MEH

CARL LEADHOLM,

      Plaintiff,

v.

CITY OF COMMERCE CITY, COLORADO,
TROY SMITH, in his individual and official capacities,
CHRISTOPHER DICKEY, in his individual and official capacities,
JJ ROUANZOIN, in his individual and official capacities,
JEREMY JENKINS, in his individual and official capacities,
MICHAEL DIENER, in his individual and official capacities, and
KEVIN LORD, in his individual and official capacities,

      Defendants.

_____

## ORDER ON CITY DEFENDANTS' MOTION TO DISMISS
_____

**Michael E. Hegarty, United States Magistrate Judge**.

      Before the Court is a Motion to Dismiss filed by Defendants City of Commerce City and

Troy Smith ("City Defendants") [filed March 13, 2017; ECF No. 57].  The motion is fully briefed,

and the Court finds that oral argument will not assist in the adjudication of the motion.  For the

following reasons and based on the entire record herein, the Court grants in part and denies in part

the City Defendants' motion.[1]

## BACKGROUND

      Plaintiff initiated this lawsuit on November 15, 2016, then filed the operative Amended

Complaint as a matter of course on February 21, 2017, alleging excessive force in violation of the

---

[1]The parties consented to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c) on
April 24, 2017.  ECF No. 74.

Fourth Amendment against the individual Defendants and deliberate indifference in hiring, training, supervision, and retention against the City Defendants pursuant to 42 U.S.C. § 1983.

I.      **Facts**

The following are factual allegations (as opposed to legal conclusions, bare assertions, or merely conclusory allegations) made by the Plaintiff in his Amended Complaint, which are taken as true for analysis under Fed. R. Civ. P. 12(b)(6) pursuant to *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

On November 18, 2014, the Plaintiff, Carl Leadholm, was driving home after working a full day at a recycling company. At some point during his drive home, Plaintiff suffered from a medical condition due to low levels of glucose in his blood, which caused him dizziness and blurred vision. This condition caused Plaintiff to swerve his vehicle and drive erratically. Defendants Dickey and Rouanzoin first encountered Plaintiff on the road, saw the vehicle swerving, and pulled him over to the side of the road. Rather than ask Plaintiff whether he was alright, Dickey and Rouanzoin immediately started to shout at him. Dickey and Rouanzoin did not attempt to secure any information from Plaintiff regarding his identity, nor explain why they pulled him over. The officers did not ask any questions about Plaintiff's medical condition. Rather, they opened the car door, pulled Plaintiff out, and slammed him onto the pavement.

Plaintiff, who had no previous interaction with law enforcement, curled into a fetal position on the pavement to protect himself. When Dickey and Rouanzoin pulled Plaintiff out of the vehicle, the truck was still in "drive" and it began to roll into oncoming traffic. Rouanzoin chased and entered the vehicle, stopped it, and shut the engine off.

While Plaintiff was still on the ground, Dickey and Rouanzoin jammed Plaintiff's face into the pavement. At that point, Defendant Diener sprayed Plaintiff in the face with pepper spray, then

Dickey, Rouanzoin, Jenkins, Diener, and Lord (the "Individual Defendants") struck Plaintiff with batons in the legs. During this beating, Dickey accidently struck Rouanzoin with his baton. Dickey also applied multiple taser strikes to Plaintiff. Further, the Individual Defendants wrenched Plaintiff's right hand behind his back causing pain and damage to his hand, fingers, and rotator cuff. These injuries necessitated two surgeries. Plaintiff will require additional surgeries every ten years to replace the joint in his finger.

Plaintiff did not resist the police officer's attempts to physically restrain him. Eventually, an ambulance was called to provide emergency care for Plaintiff. When the paramedics gave him a chance to speak, Plaintiff indicated that he was diabetic and did not feel well. The paramedics tested Plaintiff's blood glucose level and found his readings to be at a level of 35.

According to information from the University of Michigan's Health System Department of Metabolism, Endocrinology and Diabetes pertaining to hypoglycemia—or low blood glucose—a blood glucose reading of 35 is defined as follows:

> Severe hypoglycemia
> The symptoms of severe low blood sugar develop when blood sugar falls below 35-40 mg/dL and may include:
> * Seizures or convulsions
> * Loss of consciousness, coma
> * Low body temperature (hypothermia)

The attending paramedics recognized the potential danger that existed for Plaintiff and promptly administered glycogen, which likely prevented him from slipping into a diabetic coma.

In addition to the allegations raised by Plaintiff in this case, other individuals have lodged the following allegations against Commerce City and/or its police officers:

1.      In 2003, Commerce City police officers chased a suspect's vehicle at nearly 100 miles an hour. The chase ended when the suspect, chased by six officers, smashed head-on into Julie

Bailey's small truck, flipping it onto its roof and trapping and critically injuring Ms. Bailey and her son, Brandon Magnuson. Brandon died soon thereafter of injuries sustained in the crash. *Bailey v. City of Commerce City, et al.*, 05-cv-02440-WYD-CBS.

2. In 2003, Sergio Perez was repeatedly struck with a heavy flashlight by Officer Juan Gomez. As a result of the attack, Plaintiff fell to the ground, bleeding from his head and mouth and was handcuffed and beaten further. *Perez v. Gomez et al.*, 05-cv-02241-WDM-BNB.

3. In 2007, Adam Launer was arrested by a Commerce City Police Officer, Audie Vigil, without probable cause and without warrant. While Mr. Launer was handcuffed and laying face down on the ground, Officer Vigil held Mr. Launer in the prone position, sprayed his neck and back with mace or pepper spray, and punched him in the right shoulder. John Doe Officers kicked Mr. Launer in the ribs and used their boot to apply pressure from the handcuffs against his wrists. Mr. Launer suffered from a partial pneumothorax, rib injuries, bruises and contusions, and burns from the pepper spray or mace. *Launer v. Vigil, et al.*, 08-cv-01384-MSK-MJW.

4. In 2012, while on duty, Commerce City Police officer Robert Price shot and killed a family's dog and was charged with animal cruelty. Commerce City paid the family $262,000 for excessive force used against their dog. *Branson v. Price, et al.*, 13-cv-03090-REB-NYW.

Furthermore, Defendants Jenkins and Lord have been involved in the following incidents:

1. On May 6, 2010, Commerce City Police officers, including Defendant Jenkins, allegedly fired approximately nineteen gun shots in a densely populated residential area killing one, injuring another, and damaging private resident structures.

2. Defendant Lord resigned from the Commerce City Police Department November 18, 2015 after his arrest for tampering with evidence and false reporting. In that instance, Lord shot

himself in his own bullet proof vest on purpose and knowingly blamed an innocent person. He ultimately pleaded guilty, has a criminal conviction, and is on probation.

In 2011, Commerce City's police union presented Commerce City with a 23-page report urging a review of years of questionable conduct by police officers and alleged mismanagement by senior police officials. Commerce City attorney Karen Stevens was the first to review the report. Of the police union's twenty-three pages of allegations, she forwarded only eight incidences to the attention of Timothy Leary, a third-party investigator hired to look into the police union's claims, who also worked as a contractor for Commerce City's insurer, Colorado Intergovernmental Risk Sharing Agency ("CIRSA"). CIRSA would be responsible for payment if Mr. Leary's investigation found wrongdoing that led to lawsuits.

In or about January 2013, Defendant Troy Smith was named chief of police for Commerce City. *See* ECF No. 43-2. After assuming the position, Smith did not institute policies and procedures within the police department pertaining to use of force and/or the recognition of medical emergencies despite knowing about the department's "serious internal issues and officer misconduct." *Id.* In June 2015, Smith received a vote of no-confidence from sixty-seven officers who voted in support of the measure; three voted against it. Mike Violette, Executive Director of the Colorado Fraternal Order of Police told a newspaper reporter, "In 2-1/2 years, Troy Smith has managed to destroy a highly respected and much sought after, employment-wise, police department. I'd hate to see what happens in the next 2-1/2 years if changes aren't made." However, Commerce City Mayor Ford reported to the newspaper that the city counsel was "firmly behind" Smith saying, "We know there's a reform need and the chief is moving ahead with these reforms. It takes time for change to take place." Smith was eventually demoted to interim chief before he was removed.

On July 18, 2016, Commerce City Mayor Sean Ford, City Manager Brian McBroom, and

Interim Chief of Police Lowell Richardson, wrote a letter addressed to Director Ronald Davis of the U.S. Department of Justice "requesting assistance from the Department of Justice's Community Oriented Policing Division's Technical Assistance Program for Collaborative Reform." According to the letter, Commerce City had "mandated that all uniformed personnel carry Tasers as a less-lethal force option and provided training and new equipment to all officers to accomplish this goal," but sought assistance to address "serious internal issues and officer misconduct." Letter, ECF No. 43-2. These policy makers further acknowledged that

> [W]ithin the last six months two police officers [including Lord] were criminally charged for their actions while on-duty. In other cases officers have chosen to resign during the internal affairs investigative process after having been found to have engaged in conduct that likely would have resulted in termination. These incidents of misconduct on the part of police officers who are sworn to protect and serve this community have undermined the trust of the community and negatively impacted the credibility of the department and its membership who are committed to providing quality services.

*Id.* Commerce City became the thirteenth city in the country to seek and receive federal review. Commerce City Police Department is now implementing body cameras and a Citizen's Advisory Committee. Though these changes may assist with victims of excessive force who seek redress from civil rights violations, there has been little, if anything, done to prevent inadequate training.

## II.     Procedural History

Based on these factual allegations, Plaintiff claims the City Defendants "with actual knowledge of the obvious urgent need for constitutionally acceptable departmental policies and procedures concerning the hiring, training, supervision and retention of officers[,] and the obvious likelihood of injury to citizens exposed to such officers, recklessly and with deliberate indifference, did not reasonably provide such policies and procedures and failed to properly hire, train, supervise and retain the Officer Defendants complained of above. These and other failures created the danger

of harm [that] led to Mr. Leadholm's injuries in this case." Am. Compl. ¶ 55, ECF No. 43. Plaintiff seeks unspecified declaratory and injunctive relief, as well as recovery for compensatory damages, economic losses, costs, and attorney's fees. *Id.* at 4.

City Defendants filed the present motion arguing Plaintiff's constitutional claims against them should be dismissed pursuant to Rule 12(b)(6) because Plaintiff failed to allege plausibly that the violation was the result of any municipal policy, as required by the Supreme Court in *Monell v. Dep't of Soc. Servs. of New York*, 436 U.S. 658 (1978), and because the claims against the City and against Smith in his official capacity are duplicative.

Plaintiff counters that the City Defendants fail to view the allegations in the light most favorable to him and fail to acknowledge the allegations supporting his plausible claims. In addition, Plaintiff contends his allegations of a "pattern" of misconduct by Commerce City police officers, in addition to the allegations showing his injuries were an obvious or highly predictable consequence of the lack of training in use of force demonstrates the City Defendants are liable for constitutional violations. Finally, Plaintiff contends that Smith is individually liable as a supervisor because his failure to train was directly linked to the individual Defendants' use of excessive force against Plaintiff, and Smith is not immune from such liability because Tenth Circuit and Supreme Court law prior to 2014 clearly established supervisory liability for constitutional violations and the right to be free from excessive force.

City Defendants reply that "Plaintiff has failed to provide non-conclusory factual support for his claims and they are, therefore, subject to dismissal." Reply 2, ECF No. 73. They also contend that Plaintiff failed to address any arguments concerning hiring, supervision and/or retention of officers, as well as the argument that the official capacity claim against Smith is duplicative of his claim against the City. Finally, City Defendants argue that Plaintiff's cited case law is

distinguishable from the facts/allegations in this case and, thus, do not apply.

## LEGAL STANDARDS

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausibility, in the context of a motion to dismiss, means that the plaintiff pled facts which allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id. Twombly* requires a two prong analysis. First, a court must identify "the allegations in the complaint that are not entitled to the assumption of truth," that is, those allegations which are legal conclusions, bare assertions, or merely conclusory. *Id.* at 679-80. Second, the Court must consider the factual allegations "to determine if they plausibly suggest an entitlement to relief." *Id.* at 681. If the allegations state a plausible claim for relief, such claim survives the motion to dismiss. *Id.* at 680.

Plausibility refers "to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to plausible.'" *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012) (quoting *Robbins v. Okla.,* 519 F.3d 1242, 1247 (10th Cir. 2008)). "The nature and specificity of the allegations required to state a plausible claim will vary based on context." *Kan. Penn Gaming, LLC v. Collins,* 656 F.3d 1210, 1215 (10th Cir. 2011). Thus, while Rule 12(b)(6) standard does not require that a plaintiff establish a prima facie case in a complaint, the elements of each alleged cause of action may help to determine whether the plaintiff has set forth a plausible claim. *Khalik*, 671 F.3d at 1191.

## ANALYSIS

Plaintiff brings his Second Claim for Relief against Commerce City and against Smith, in

both his individual and official[2] capacities, for "deliberately indifferent hiring, training[,] supervision[,] and retention." Am. Compl. 14-15. The City Defendants challenge all aspects of this claim pursuant to Rule 12(b)(6).

## I.   Official-Capacity Claims

### A.   Smith

The Court agrees with the City Defendants' unchallenged contention that Plaintiff's official capacity claim against Smith is duplicative of his claim against Commerce City. "[A] section 1983 suit against a municipality and a suit against a municipal official acting in his or her official capacity are the same." *Stuart v. Jackson*, 24 F. App'x 943, 956 (10th Cir. 2001) (quoting *Myers v. Okla. Cnty. Bd. of Cnty .Comm'rs*, 151 F.3d 1313, 1316 n. 2 (10th Cir. 1998)); *see also Watson v. City of Kansas City*, 857 F.2d 690, 695 (10th Cir. 1988) (treating as one claim the plaintiff's claim against a municipality and claims against municipal officials acting in their official capacities). As the Supreme Court explained, "[o]fficial-capacity suits . . . generally represent only another way of pleading an action against an entity of which an officer is an agent. As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against an entity." *Ky. v. Graham*, 473 U.S. 159, 165-66 (1985) (citations and quotations omitted).

Consequently, where a plaintiff sues both the municipality and municipal official in an official capacity under the same theory of recovery, courts have dismissed the official capacity claim as "duplicative" or "redundant" of the claim against the municipal entity. *Barr v. City of*

---

[2]Although the "Parties" section of the Amended Complaint identifies Smith as being "sued in his individual capacity" (Am. Compl. ¶ 6), the caption of the pleading lists Smith as sued "in [his] individual and official capacities." *Id.* Accordingly, in an abundance of caution, the Court will construe the claims as raised against Smith in both capacities.

*Albuquerque*, No. 12-CV-01109-GBW, 2014 WL 11497831, at *13 (D. N.M. Apr. 8, 2014) (citing *Starrett v. Wadley*, 876 F.2d 808, 813 (10th Cir. 1989) (despite presence of official capacity claim, "the appeal effectively is between only two parties: the County and plaintiff")); *see also Doe v. Douglas Cnty. Sch. Dist.*, 775 F. Supp. 1414, 1416 (D. Colo. 1991) ("redundant" official capacity claim dismissed); *Riendl v. City of Leavenworth*, 361 F. Supp. 2d 1294, 1302 (D. Kan. 2005) (same). As such, Plaintiff's claim against Defendant Smith in his official capacity is dismissed. *See Hays v. Ellis*, 331 F. Supp. 2d 1303, 1306 n.2 (D. Colo. 2004).

B.    <u>Commerce City</u>

City Defendants contend the Plaintiff has not plausibly pled his claim for municipal liability under 42 U.S.C. §1983, because he has not sufficiently alleged either an underlying constitutional violation or an official policy that directly caused the claimed constitutional violation. Mot. ¶ 17.

The Supreme Court recognizes that municipalities and other local government units are "persons" to whom Section 1983 applies. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 n.55 (1978). However, local governments can be liable under Section 1983 "only for their *own* illegal acts." *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (internal quotation and citations omitted) (emphasis in original). Hence, "[a] municipality may not be held liable under § 1983 solely because its employees inflicted injury on the plaintiff." *Hinton v. City of Elwood, Kan.*, 997 F.2d 774, 782 (10th Cir. 1993) (citing *Monell*, 436 U.S. at 692). A plaintiff cannot state a claim for relief under § 1983 by pointing merely to an isolated or single incident. *See Butler v. City of Norman*, 992 F.2d 1053, 1055–56 (10th Cir. 1993) (isolated incident of excessive force by a police officer, even coupled with municipality's failure to discipline the officer, was inadequate to form the basis of municipal liability). Rather, to prove a Section 1983 claim against a municipality, a plaintiff must demonstrate (1) the existence of a municipal policy or custom, which (2) directly caused the injury

alleged. *Hinton*, 997 F.2d at 782 (citing *City of Canton v. Harris*, 489 U.S. 378, 385 (1989)).

In establishing the first requirement, a plaintiff may show a municipal policy or custom in the form of any of the following:

> (1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions - and the basis for them - of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.

*Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010) (quoting *Brammer-Hoetler v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1189-90 (10th Cir. 2010)) (internal quotations omitted).

Here, Plaintiff alleges Commerce City "with actual knowledge of the obvious urgent need for constitutionally acceptable departmental policies and procedures concerning the hiring, training, supervision and retention of officers[,] and the obvious likelihood of injury to citizens exposed to such officers, recklessly and with deliberate indifference, did not reasonably provide such policies and procedures and failed to properly hire, train, supervise and retain[3] the [Individual] Defendants . . . . These and other failures created the danger of harm [that] led to Mr. Leadholm's injuries in this case." Am. Compl. ¶ 55. The standards for pleading a municipal liability claim are strenuous, and those for asserting a viable failure to train claim particularly so. *See Connick*, 563 U.S. at 61 ("A

---

[3]The Court agrees with City Defendants that Plaintiff's theories of "failure to hire, . . . supervise and retain" are merely conclusory, particularly since the allegations (and even the headings) in the Amended Complaint mention only "failing" or "failure" to train and "inadequate" or "poor" training. Am. Compl. ¶¶ 24, 33, 36, 37, 40; also at 7. Moreover, Plaintiff focuses his response to the present motion on the City Defendants' alleged failure to train and does not address any arguments challenging his allegations of failures to hire, supervise, and retain. *See* Resp., ECF No. 65.

municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train."). "[P]roving that a municipality itself actually caused a constitutional violation by failing to train the offending employee presents 'difficult problems of proof,' and we must adhere to a 'stringent standard of fault,' lest municipal liability under § 1983 collapse into *respondeat superior*." *Id.* at 69. In this context, Plaintiff must allege facts sufficient to suggest that the failure to train "amounts to deliberate indifference to the rights of persons with whom the [untrained employees] come into contact." *See id.* at 61 (citing *Canton*, 489 U.S. at 388).

Deliberate indifference is established only "when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights," but they "choose to retain that program." *Id.* For example,

> A pattern of similar constitutional violations by untrained employees is "ordinarily necessary" to demonstrate deliberate indifference for purposes of failure to train. Policymakers' "continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action – the 'deliberate indifference' – necessary to trigger municipal liability." Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights.

*Id.* at 62. Apparently, in an effort to demonstrate a pattern of similar constitutional violations, Plaintiff set forth in the Amended Complaint the allegations by other individuals against Commerce City's police department in 2003, 2007, and 2012. However, the Supreme Court and the Tenth Circuit make clear that such "violations" must place policymakers "on actual or constructive notice that a *particular omission* in their training program causes city employees to violate citizens' constitutional rights." *Id.* at 61 (emphasis added). None of the allegations listed in the Amended Complaint involve excessive force against a driver who was non-responsive due to a medical condition. The same is true regarding Plaintiff's allegations that Defendants Jenkins and Lord were

involved in incidents in 2010 and 2015, respectively, regarding Commerce City police officers' repeated firing of weapons in a residential area (2010) and Lord's firing of a weapon that resulted in a criminal conviction (2015). Although possible that these incidents could be construed as "excessive" force, they are not otherwise "similar" to the Plaintiff's allegations in this case. *See Connick*, 563 U.S. at 62-63 ("Because [unrelated] incidents are not similar to the violation at issue here, they could not have put Connick on notice that specific training was necessary to avoid this constitutional violation.").

In *Connick*, the Supreme Court discussed *Canton*'s opinion regarding "single-incident" liability saying *Canton* "left open the possibility that, 'in a narrow range of circumstances,' a pattern of similar violations might not be necessary to show deliberate indifference." *Id.* at 61. The Court explained that the hypothetical scenario posed in *Canton*[4] demonstrated "an obvious need for specific . . . training." *Id.* at 64 ("The Court sought not to foreclose the possibility, however rare, that the unconstitutional consequences of failing to train could be so patently obvious that a city

---

[4]In *Canton*,

The Court posed the hypothetical example of a city that arms its police force with firearms and deploys the armed officers into the public to capture fleeing felons without training the officers in the constitutional limitation on the use of deadly force. *Canton, supra*, at 390, n. 10, 109 S.Ct. 1197. Given the known frequency with which police attempt to arrest fleeing felons and the "predictability that an officer lacking specific tools to handle that situation will violate citizens' rights," the Court theorized that a city's decision not to train the officers about constitutional limits on the use of deadly force could reflect the city's deliberate indifference to the "highly predictable consequence," namely, violations of constitutional rights.

*Connick*, 563 U.S. at 63-64.

could be liable under § 1983 without proof of a pre-existing pattern of violations.").[5]  But, citing

*Canton*, the Court cautioned, "showing merely that additional training would have been helpful in

making difficult decisions does not establish municipal liability. '[P]rov[ing] that an injury or

accident could have been avoided if an [employee] had had better or more training, sufficient to

equip him to avoid the particular injury-causing conduct' will not suffice."  *Id.* at 68 (citation

omitted).

Here, following *Connick*'s reasoning, the Court finds Plaintiff's allegations in this case, taken

as true at this early stage in the proceeding, more analogous to the hypothetical set forth in *Canton*

(reflecting an "obvious need for specific training") than to the circumstances presented in *Connick*

(no obvious need to train prosecutors in their *Brady* obligations).  *See Connick*, 563 U.S. at 64.

Although Plaintiff's allegations are reasonably funneled down to one incident of excessive force,

the incident involved *five* Commerce City police officers all alleged to have participated in the use

of excessive force against an individual allegedly suffering from a medical condition.  Taking these

allegations as true, and given the frequency with which police officers attempt to stop persons

driving unlawfully and the predictability that a lack of training will violate the constitutional rights

of a medically-inhibited driver, the Court finds the allegations sufficient at this stage of the litigation

to demonstrate the City's deliberate indifference to the predictable consequence of violating an ill

---

[5]Notably, Plaintiff cites two pre-*Connick* opinions by the Tenth Circuit for the
proposition that a claimant must first prove the training was, in fact, <u>inadequate</u> before
demonstrating the other factors necessary to prove a claim for failure to train officers in the use
of force.  Specifically, these courts held "a showing of specific incidents which establish a
pattern of constitutional violations is not necessary to put the City on notice that its training
program is inadequate" (*Allen v. Muskogee*, 119 F.3d 837, 842 (10th Cir. 1997)) and "a single
incident of excessive force can establish the existence of an inadequate training program if there
is some other evidence of the program's inadequacy" (*Brown v. Gray*, 227 F.3d 1278, 1286 (10th
Cir. 2000)).  To the extent these opinions are, in any relevant way, inconsistent with the Supreme
Court's more recent opinion, the Court will, of course, rely on *Connick*.

driver's rights. *See id.* at 63-64.

Of course, "a municipality [cannot] be held liable for the actions of its employees if those actions do not constitute a violation of a plaintiff's constitutional rights." *Trigalet v. City of Tulsa, Okla.*, 239 F.3d 1150, 1154 (10th Cir. 2001); *see also City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have *authorized* the use of [the behavior] is quite beside the point.") (emphasis in original). "A plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 678. Here, four of the five individual Defendants in this case have filed Answers to the Amended Complaint (ECF Nos. 52, 59); accordingly, at this early stage of the proceeding at which the merits of the case have not been adjudicated, the Court finds it proper to deny the City's motion to dismiss Plaintiff's Second Claim for Relief against it.

## II.     Individual-Capacity Claim

Plaintiff alleges that "[a]fter taking over [as chief of police], Defendant Smith failed to institute policies and procedures within the Department pertaining to use of force and the recognition of medical emergencies despite having ample knowledge that the Department was plagued by serious internal issues and officer misconduct. Defendant Smith's *deliberate indifference* gave rise to the conditions which allowed [Plaintiff] to be brutally assaulted." Am. Compl. ¶ 38 (emphasis added).

The City Defendants assert that Smith, in his individual capacity, is entitled to qualified immunity from liability for Plaintiff's claim. Qualified immunity protects from litigation a public official whose possible violation of a plaintiff's civil rights was not clearly a violation at the time of the official's actions. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "It is an entitlement

not to stand trial or face the other burdens of litigation." *Ahmad v. Furlong*, 435 F.3d 1196, 1198 (10th Cir. 2006) (internal quotations and citations omitted). "The privilege is an immunity from suit rather than a mere defense to liability." *Id.*

When a defendant asserts the defense of qualified immunity, the burden shifts to the plaintiff to overcome the asserted immunity. *Riggins v. Goodman*, 572 F.3d 1101, 1107 (10th Cir. 2009). "The plaintiff must demonstrate on the facts alleged both that the defendant violated his constitutional or statutory rights, and that the right was clearly established at the time of the alleged unlawful activity." *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). The Supreme Court affords courts the discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236; *see also Christensen v. Park City Mun. Corp.*, 554 F.3d 1271, 1277 (10th Cir. 2009).

A.     Was Plaintiff's Right to be Free from Excessive Force Clearly Established?

Here, the City Defendants argue that there was no clearly established law to put Smith on notice that his deliberate indifference to the need for adequate use of force training would result in the violation of Plaintiff's rights. To overcome the defense of qualified immunity, the right alleged to have been violated must have been clearly established in the law at the time of the alleged violation. *Pearson*, 555 U.S. at 232. For a constitutional right to be clearly established, its contours must be "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). A plaintiff demonstrates that a constitutional right is clearly established by referring to cases from the Supreme Court, the Tenth Circuit, or the weight of authority from other circuits. *Riggins*, 572 F.3d at 1107.

Plaintiff cites several cases in which a plaintiff's right to be free from the use of excessive force was established, but he cites no case on which this Court may rely that establishes a plaintiff's

right to be free from a supervisor's deliberate indifference to the need to train law enforcement officers as to the proper use of force. *See* Resp. 20-21. The only opinion Plaintiff cites from the Tenth Circuit involving a supervisor's failure to train officers in the use of force is *Meade v. Grubbs*, 841 F.2d 1512 (10th Cir. 1988) in which the Tenth Circuit found the plaintiff's allegations sufficient to state a "supervisory liability" claim against a sheriff for "improperly hiring, training, supervising[,] and disciplining" subordinate deputies who severely beat the plaintiff after he was arrested and while he awaited booking. *Id.* at 1528. However, before the incident at issue here occurred, this portion of *Meade* was abrogated by *Iqbal*, 556 U.S. at 677 (rejecting the proposition that a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to a constitutional violation by the supervisor), which was recognized in *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760 (10th Cir. 2013).

In *Schneider*, the Tenth Circuit affirmed that a plaintiff must show an "affirmative link" between the supervisor and the constitutional violation, which requires a demonstration of the following: (1) personal involvement; (2) sufficient causal connection; and (3) culpable state of mind. *Id.* at 767. "[A] plaintiff may establish the first prong with evidence that 'the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy' that caused the constitutional harm." *Keith v. Koerner*, 707 F.3d 1185, 1188 (10th Cir. 2013) (quoting *Dodds*, 614 F.3d at 1199) ("*Keith I*"). Second, "[a] plaintiff must establish the requisite causal connection by showing the defendant set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of [his] constitutional rights." *Schneider*, 717 F.3d at 768 (citations, internal brackets and quotation marks omitted). Finally, "[t]he third element requires the plaintiff to show that the defendant took the alleged actions with the requisite state of mind" which "depends on the type of claim a plaintiff brings." *Id.* at 769.

Although *Schneider* involves allegations against a law enforcement officer's supervisors (including the chief of police) for failure to train, the claim raised by the plaintiff was not for excessive force and the Tenth Circuit did not reach the merits of the claim because it was not properly raised on appeal. *See id.* at 773. Nevertheless, the Court finds *Schneider* and the cases on which it relies articulate the "clear contours" of a claim against a police chief for failure to train officers concerning physical contact with (or assault of) a citizen, sufficient to place Smith on notice of Plaintiff's "clearly established" right to be free from Smith's deliberate indifference to such conduct. Accordingly, the Court will proceed to the second prong of the qualified immunity analysis to determine whether Plaintiff plausibly alleges a post-*Iqbal* claim against Smith pursuant to *Schneider*.

   B.     Is the Constitutional Violation Alleged Against Smith Plausible?

Personal participation is an essential element in a civil rights action. *See Bennett v. Passic*, 545 F.2d 1260, 1262-63 (10th Cir. 1976); *Ky. v. Graham*, 473 U.S. 159, 166 (1985). A supervisor can only be held liable for his or her own deliberate intentional acts. *See Iqbal*, 556 U.S. at 676; *Serna v. Colo. Dep't of Corrs.*, 455 F.3d 1146, 1151 (10th Cir. 2006) ("Supervisors are only liable under § 1983 for their own culpable involvement in the violation of a person's constitutional rights."); *see also Fogarty v. Gallegos*, 523 F.3d 1147, 1162 (10th Cir. 2008) ("[Section] 1983 does not recognize a concept of strict supervisor liability; the defendant's role must be more than one of abstract authority over individuals who actually committed a constitutional violation."). Thus, as set forth above, "Section 1983 allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy the enforcement of which 'subjects, or causes to be subjected' that plaintiff 'to the deprivation of any rights . . . secured by the Constitution . . . .'" *Dodds*, 614 F.3d at 1199

(interpreting *Iqbal* and quoting 42 U.S.C. § 1983).

The Tenth Circuit recently confirmed that it has "not determined whether a failure to train satisfies the post-*Iqbal* personal involvement requirement."  *Keith v. Koerner*, 843 F.3d 833, 838 (10th Cir. 2016) ("*Keith II*").  In *Keith II*, the court concluded it need not reach the question because it determined the plaintiff's allegations insufficient under the more lenient pre-*Iqbal* standard for supervisory liability:

> . . . a supervising prison official may be liable "[w]here there is essentially a complete failure to train, or training that is so reckless or grossly negligent that future misconduct is almost inevitable." *Houston v. Reich*, 932 F.2d 883, 888 (10th Cir. 1991) (alteration in original) (citation omitted). It is not enough to allege "general deficiencies" in a particular training program. *Lopez v. LeMaster*, 172 F.3d 756, 760 (10th Cir. 1999). Rather, a plaintiff "must identify a specific deficiency in the [entity's] training program closely related to his ultimate injury, and must prove that the deficiency in training actually caused his jailer to act with deliberate indifference to his safety." *Id.*

*Id.* at 838-39.  The *Keith II* plaintiff, who claimed she was raped by a prison maintenance instructor, relied on an audit report which concluded that the prison facility "failed to provide targeted training" relating to unique issues arising in a female-only facility.  The court held, "Even if the Audit Report creates a dispute about the extent of training provided to TCF employees, it does not provide a basis from which a jury could find 'essentially a complete failure to train' that made sexual misconduct 'almost inevitable.'" *Id.* at 839 (quoting *Houston*, 932 F.2d at 888).

In this case, the Plaintiff's allegations characterize Commerce City's use of force policy/program as "inadequate," in that the program failed to train officers "pertaining to use of force and the recognition of medical emergencies."  Am. Compl. ¶¶ 37, 38.  The Court finds these allegations, taken as true, "identify a specific deficiency in [Commerce City's] training program closely related to [Plaintiff's] ultimate injury" sufficient to meet the standard imposed in *Keith II*.  *See* 843 F.3d at 839.

19

With that said, the Court is still unclear as to whether a failure to train claim satisfies the post-*Iqbal* personal involvement requirement. *Id.* at 838. Such a finding is not necessary in this case, however, because the Court finds the allegations insufficient to demonstrate the necessary "affirmative link" between Smith and the constitutional violation.

Here, the allegations, taken as true, reflect that Smith was named chief of police in late 2012 or early 2013, twelve to eighteen months after Commerce City's police union presented Commerce City with a 23-page report urging a review of years of questionable conduct by police officers and alleged mismanagement by senior police officials. During Smith's tenure, the individual Defendants allegedly assaulted Plaintiff during a traffic stop while he was suffering a diabetic episode, which resulted in his claimed injuries. At some point after Smith's departure, Commerce City Mayor Ford, City Manager McBroom, and Interim Chief of Police Richardson wrote a letter to Director Davis "requesting assistance from the Department of Justice's Community Oriented Policing Division's Technical Assistance Program for Collaborative Reform" to address "serious internal issues and officer misconduct." Plaintiff alleges that Smith, while chief of police, did not institute policies and procedures within the police department pertaining to use of force and the recognition of medical emergencies despite knowing about such "issues and officer misconduct."

Plaintiff's allegations must reflect that Smith "set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of [his] constitutional rights." *Schneider*, 717 F.3d at 768. There are no allegations that Smith, as police chief, was charged with implementing an adequate use of force policy/training program, but failed to do so. Nor do the allegations demonstrate that during his tenure, Smith was made aware of the inadequacy of the training policy/program but failed to remedy it before the Plaintiff was stopped and allegedly assaulted by the individual Defendants. *See, e.g., Keith I*, 707 F.3d at 1189 (finding

allegations sufficient to demonstrate affirmative link between the warden and the prison officer's sexual misconduct against an inmate where the complaint incorporated an "Audit Report" of the prison facility, which indicated previous incidents (during the warden's tenure) of both sexual misconduct and undue familiarity, inconsistent disciplinary responses to such incidents, structural policy problems at the facility, and a lack of appropriate training programs).

Rather, as stated, these allegations reflect Smith's "mere knowledge of his [subordinates'] discriminatory purpose" and/or conduct, which is insufficient to state a § 1983 claim against Smith in his individual capacity. *See Iqbal*, 556 U.S. at 677 (discriminatory purpose "involves a decisionmaker's undertaking a course of action because of, not merely in spite of, the action's adverse effects upon [the plaintiff]") (citation and internal quotations marks and brackets omitted); *Schneider*, 717 F.3d at 767 (an "affirmative link" requires "more than a supervisor's mere knowledge of his subordinate's conduct").

Therefore, because the Plaintiff fails to state a plausible claim for individual liability against former Commerce City police chief Smith, the Court will grant Defendants' motion to dismiss Plaintiff's Second Claim for Relief against him.

## CONCLUSION

In sum, the Court finds that Plaintiff has failed to state plausible claims for deliberately indifferent hiring, supervision, and retention against the City Defendants and for deliberately indifferent training against Smith, in both official and individual capacities. However, the Court concludes Plaintiff's allegations are sufficient, taken as true at this early stage, to state a plausible claim for municipal liability against Commerce City. Accordingly, based upon the foregoing reasons, the Court **grants in part and denies in part** the Motion to Dismiss filed by Defendants City of Commerce City and Troy Smith ("City Defendants") [filed March 13, 2017; ECF No. 57].

The Court directs the Clerk of the Court to dismiss Defendant Troy Smith from the case.

SO ORDERED at Denver, Colorado this 9th day of May, 2017.

BY THE COURT:

*Michael E. Hegarty*

Michael E. Hegarty
United States Magistrate Judge