1

```
 1            IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLORADO
 2
      Case No. 16-cv-02786-MEH
 3    _____

 4    CARL LEADHOLM,

 5         Plaintiff,

 6    vs.

 7    THE CITY OF COMMERCE CITY, et al.,

 8         Defendants.
      _____
 9            Proceedings before MICHAEL E. HEGARTY, United

10    States Magistrate Judge, United States District Court for the

11    District of Colorado, commencing at 11:16 a.m., August 15,

12    2017, in the United States Courthouse, Denver, Colorado.

13    _____

14            WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS

15    ARE HEREIN TYPOGRAPHICALLY TRANSCRIBED. . .

16    _____

17                        APPEARANCES

18            DAVID FISHER, Attorney at Law, appearing for the

19    Plaintiff.

20            ERIC ZIPORIN and RYAN McGRATH, Attorneys at Law,

21    appearing for the Defendants Commerce City, Mr. Diener and

22    Mr. Jenkins.

23            PATRICK HAINES, Attorney at Law, appearing for the

24    Defendants Mr. Rouanzoin and Mr. Dickey.

25    _____
                       DISCOVERY CONFERENCE
```

```
 1              P R O C E E D I N G S

 2            (Whereupon, the within electronically recorded

 3    proceedings are herein transcribed, pursuant to order of

 4    counsel.)

 5            THE COURT:  Carl Leadholm vs. City of Commerce City

 6    and others.  For the plaintiff, please.

 7            MR. FISHER:  For the plaintiff, David Fisher.  Good

 8    morning, Your Honor.

 9            THE COURT:  Thank you, Mr. Fisher.  Good morning to

10    you.

11            And for the defendants.

12            MR. ZIPORIN:  Good morning, Your Honor.  Eric

13    Ziporin and Ryan McGrath on behalf of the City, Officers

14    Diener and Jenkins.

15            THE COURT:  Okay.

16            MR. HAINES:  Patrick Haines, Your Honor, on behalf

17    of individual defendants Rouanzoin and Dickey.

18            THE COURT:  What about Lord?

19            MR. ZIPORIN:  He is out.

20            THE COURT:  He is out?  Okay.  I'm just looking at

21    the scheduling order.  Diener, Jenkins, and what was the --

22    Smith.

23            MR. ZIPORIN:  George Smith is out as well, Your

24    Honor, on motion.

25            THE COURT:  All right.  So those two are out.  Just
```

1       five defendants remaining?

2                MR. ZIPORIN:  Yes.

3                THE COURT:  Okay, excellent.  All right.

4                Who wants to start?

5                MR. FISHER:  I can start, I guess, Your Honor.

6                THE COURT:  Go ahead.

7                MR. FISHER:  So as Your Honor knows, we had a

8       discovery conference on July 26 it was, and there is still

9       some outstanding issues regarding discovery.  I mean, one I

10      just put in our response brief to yesterday.  I still haven't

11      gotten a lot of documents from Commerce City.  I haven't

12      gotten all the five years' worth of their investigations that

13      have do with my Monell claim.  I haven't gotten anything in

14      terms of the DOJ review yet because that's still to be ruled

15      on by Your Honor.

16               At the time we had the last conference, I still had

17      not yet gotten them all the medical records from Mr.

18      Leadholm, so a lot of these delays -- I still hadn't gotten

19      the personnel files of two of the main officers.  So a lot of

20      those delays led us to say we can't really depose everybody

21      we need to depose in the allotted time.  We need to extend

22      the schedule.

23               So after the conference on the 26th, Mr. Ziporin

24      approached me and said, Do you think we should push back

25      discovery in this case?  And I said, Let me think about it.

1     I got back to him later in the day, I said, I think that's a

2     good idea because we have a lot of outstanding stuff.  I

3     apparently mistakenly understood that to mean when we're

4     pushing back discovery, we're also going to push back the

5     expert deadlines.  So it's my fault for misunderstanding the

6     situation and not formalizing it, so --

7               THE COURT:  Sure.

8               MR. FISHER:  -- I got a report, an expert report

9     from them on August 3, which was the deadline, and I was kind

10    of surprised by it.  I thought we were going to push

11    everything back.  I guess it shouldn't be that surprising,

12    being that that was the deadline that was set on the

13    scheduling order and we hadn't actually modified it yet.  So

14    I think one or two days after that I submitted an e-mail,

15    Hey, are you guys okay with pushing back everything?  I think

16    I suggested four months.  They came back and said, We'll

17    agree to push back fact discovery, but not the expert

18    deadlines.  So that's sort of where we are now.

19               I mean, I can explain more as to why I don't have

20    reports yet, what I can give and what kind of timeframe, but

21    I think overall, if we're agreeing to push back the regular

22    deadlines by 90 days, it's not going to delay the case even a

23    day further if we also push back the expert deadline 90 days,

24    and I don't think it will really prejudice the defendants

25    either.

1          So I understand that they're making that objection.

2     I just think, in fairness, we should push back everything.

3          THE COURT:  If you were allowed to designate

4     experts, what would you -- what type of experts would you be

5     designating?

6          MR. FISHER:  Okay.  And I was going to suggest as a

7     possible remedy in the meantime -- I can't get all the

8     reports in in short order, but I can, by Friday -- I can tell

9     you now, plus I can, by Friday, give them the names of all

10    the experts, their CVs, their prior testimony.  I can do that

11    all by Friday.  It's just the reports I'm not going to be

12    able to do by then.

13         THE COURT:  Okay.

14         MR. FISHER:  But in answer to your question, a

15    police practices' expert, a vocational rehabilitation expert,

16    who is going to work in conjunction with an economist, and an

17    expert to talk about his PTSD.

18         THE COURT:  Okay.  Do you know who these people

19    are?

20         MR. FISHER:  Yes.

21         THE COURT:  And you've known who they are for how

22    long?

23         MR. FISHER:  I've hired one, the police practices'

24    expert, probably a month ago and been consulting with him.

25    The others I have not yet retained, although I plan to do so

1    this week for the most part, and I've only started consulting

2    with them in the last couple of weeks.

3           THE COURT:  Okay.  Does anybody want to say

4    anything on that side of the room?

5           MR. ZIPORIN:  Of course, Your Honor.  I'm going to

6    stand at the lectern, if that's okay with you.

7           THE COURT:  Sure.

8           MR. ZIPORIN:  I think Mr. Fisher did a nice job of

9    summarizing where we're at in terms of the issues.  Let's

10   start with what's not at issue is, of course, we have no

11   objection to an extension of the dispositive motion or the

12   discovery deadlines.

13          I communicated this morning with Mr. Fisher to make

14   sure we were on the same page in terms of the expert

15   deadlines, and to the extent he was just seeking an extension

16   of the rebuttal deadline, I indicated to him we had no

17   objection to that, but he indicated he wanted to seek an

18   extension to the original or the affirmative expert deadline.

19   So that's really all that's at issue here today.

20          The conversation that we had after the -- we had a

21   brief conversation before the status conference or discovery

22   conference on July 26 and a brief one after.  And the content

23   of that, Your Honor, was because of these document issues and

24   because of the likely request that we would be seeking the

25   Court to do an in-camera inspection, that it's going to be a

1    while before people had documents that they needed, but the

2    context of those conversations were depositions.  And I

3    raised that issue because I figured there was a lot of

4    documents that we were going to need that we didn't have yet.

5    And then after the hearing that Your Honor had basically

6    ordered be produced and we got depositions set for, I think,

7    it was this week or next week.  And so that was why I brought

8    up the issue saying, Look, I'm going to need more time and so

9    I want to -- I want to think about pushing back those depos.

10         Mr. Fisher indicated he needed some time to think

11   about it and that he also needed to think about postponing

12   defendants' depositions because we had those scheduled as

13   well.  So that was the scope of that conversation.

14         At no point was there a discussion about postponing

15   the expert deadlines.  If Mr. Fisher interpreted the

16   discovery deadline to mean fact and expert, I guess that

17   makes some sense, but I want it to be clear to the Court

18   there was no conversation whatsoever about experts.

19         THE COURT:  Right.  Would there be any principal

20   reason not to join -- in the abstract, not to join expert and

21   fact discovery extensions -- expert designation and discovery

22   extensions?

23         MR. ZIPORIN:  Well, there had been no conversation

24   about experts at all.  And so the conversation -- I

25   understand what your point is, being how the two can be tied

1    together, but the conversations that we had had to that point

2    were solely with regard to party depositions.

3            Our position is and remains today that certainly

4    with all of the experts that Mr. Fisher just identified, he

5    had what he needed in his possession to make those

6    identifications as of August 3.

7            THE COURT:  No doubt, yeah.

8            MR. ZIPORIN:  And so there wasn't anything that was

9    really needed to be done in terms of additional fact

10   discovery, which would, in our view, warrant the extension of

11   the expert deadline, if that answers your question.

12           THE COURT:  It kind of does.  Here is the way

13   things often happen from a human perspective.

14           You think we all are agreeing on some extensions

15   and one side thinks this all gets extended and you're

16   thinking, Well, we've only talked about this getting

17   extended.  So I guess, absent some kind of reason that you

18   could give me that it would not fall in the category of

19   excusable neglect, I'll probably extend it; but if you could

20   give me a reason why it would not fall into the category of

21   excusable neglect, then I might not.

22           MR. ZIPORIN:  And where the Court is going

23   obviously with this is that Mr. Fisher has mentioned

24   prejudice, but we don't even get to prejudice yet.  Under

25   16(b) under Punko (ph), we get to excusable neglect or good

1    cause.

2         THE COURT:  Right.

3         MR. ZIPORIN:  And so reiterating what I just said,

4    Your Honor, they had everything they needed to, not only

5    do -- they could have filed a motion in advance of the

6    deadline.  If there was any ambiguity in our conversation --

7         THE COURT:  That's obviously the far -- well, it's

8    the presumptive proper way to do it, is you don't wait until

9    a deadline has past.

10        MR. ZIPORIN:  Right.  And we didn't get a conferral

11   on the extension of an expert until -- it was actually five

12   days after the deadline, so August 8 was the first that we

13   got a formal request or informal request to extend that

14   deadline.

15        So the proper approach would have been to confer

16   with us, get our position on that in advance of the deadline,

17   and file the motion.  Now, once that deadline comes and goes,

18   then the question becomes, Is there a good cause for them to

19   have missed that deadline?

20        THE COURT:  Right.

21        MR. ZIPORIN:  And our position is there is not.

22   Particularly -- I don't know the scope of their police

23   practices' expert.  I assume they're going to hire one to

24   talk about the force used during the event was unreasonable,

25   and I assume they're going to hire somebody to address these

1    training issues.  But with that first category, they

2    certainly had everything they needed with regard to the

3    incident in their possession since our initial disclosures,

4    which were the police reports.  That was way back in April

5    that we provided those police reports.  They certainly had

6    access to their client to the extent that he remembers what

7    happened.  And so there is no good cause for now after the

8    deadline for them to seek an expert on that use-of-force

9    issue.

10          The training issue -- these are things they alleged

11   in their complaint.  These lack of training with regard to

12   the medical issue and the lack of training with regard to the

13   force, again all things pled in the complaint, so

14   theoretically, they did some Rule 11 investigation and they

15   could have -- they had what they needed to identify an

16   expert.

17          We have produced, in response to written discovery,

18   July 10, three weeks before the deadline, we gave them

19   training information.  They've got all the training logs for

20   all of the named defendants.  So to the extent that they

21   could hire an expert to look at those training logs to say,

22   Here is some deficiencies or maybe they're not deficient,

23   they had what they needed.  And so there is no -- nothing

24   that they're waiting -- still waiting for in terms of the

25   training history of the involved officers.

1          These medical experts, Your Honor, Mr. Fisher has

2     just conceded that he didn't even approach these experts

3     until after the deadline.  And so where is the good cause and

4     where is the due diligence in terms of attempting to even

5     meet the original deadline?

6          THE COURT:  Right, understood.

7          MR. ZIPORIN:  So, you know, our position is that --

8     that there should be no extension to the expert deadline, but

9     if the Court is inclined to grant it, again, I don't know

10     what -- the scope of it at least should be limited.

11     Mr. Fisher may have some response to he doesn't have

12     everything that he needs, but he certainly has everything he

13     needs with regard to the economist, the voc rehab, the

14     medical doctor he's talking about, and any expert on the use

15     of force for the incident.  That's everything he has had

16     since day one.

17          And so the only thing arguably that he could

18     contend that he doesn't have that he needs would be some sort

19     of information related to the Monell claim.  And maybe he can

20     expand further on it, but it's our position that he's got

21     more than enough.  And with that said, hire an expert to say,

22     Look, based on what I've seen, they haven't given -- I don't

23     have enough documents, or it appears, at least from now,

24     based on their lack of production, there is no training with

25     regard to categories A, B, or C, but at least meet the

1   deadline or file a motion in advance of the deadline.

2           THE COURT:  Okay.  Anybody else want to say

3   anything?

4           MR. McGRATH:  I would just add, Your Honor, in the

5   interest of efficiency, if the excusable neglect question has

6   been answered to your satisfaction, I think there is real

7   prejudice here.  I think Mr. Ziporin has covered excusable

8   neglect ably, but we have now provided, by timely making

9   expert disclosures on the 3rd of August, at least a partial

10  road map to the plaintiffs that they can now exploit.

11          THE COURT:  Who did you designate?

12          MR. McGRATH:  We've designated an endocrinologist

13  to speak to the management of the diabetes condition, what

14  that -- impact that may have had on the incident and we've

15  designated a procedure -- police procedures' expert, correct?

16          MR. ZIPORIN:  Just on the training issues.

17          MR. McGRATH:  On the training issue only --

18          THE COURT:  Okay.

19          MR. McGRATH:  -- not on use of force.

20          THE COURT:  Okay.

21          MR. McGRATH:  And one of those was accompanied by a

22  full report -- or an endocrinologist who has not prepared a

23  full report because she had very limited medical records --

24          THE COURT:  Understood.

25          MR. McGRATH:  -- but she is on record as to what

1    her opinions are based on what she knows.

2              THE COURT:  So, obviously, he's still in the time

3    where he could rebut those with an expert.

4              MR. ZIPORIN:  Yes, Your Honor, but those rebuttals

5    be limited to the scope.

6              THE COURT:  No, understood, understood.

7              MR. ZIPORIN:  And that, I think, Your Honor, is the

8    prejudice that I want the Court to consider.  Thank you.

9              THE COURT:  Okay, go ahead.

10             MR. FISHER:  Thank you.  So a couple of things.

11             One in terms of me having everything I need from my

12   experts.  Some of them, yes; some of them no.  The police

13   practices' expert can at this point opine on the use of force

14   in the incident and whether or not it was excessive.  But

15   what he can't opine on are the larger Monell issues until we

16   get the use-of-force reports and the investigations for the

17   past five years and all that corresponds within DOJ.  He

18   can't really opine on the systematic failure of Commerce City

19   and what they're doing in terms of training, supervision,

20   punishment, those kinds of things.

21             Also, when I've been talking to -- I did consult

22   them before the deadline, all of these experts.  I haven't

23   hired some of them yet.  But in terms of the PTSD, vocational

24   rehab, the economist, all of them said, Yes, I would like to

25   meet with your client, but I would really like to see his

1    deposition transcript.  And some of them said, I would like

2    to see what the cops have to say and I want to -- and maybe

3    that's a little less relevant; but they really want to see

4    his deposition transcript to get a full idea of what the

5    damages are, exactly what he said happened, how that

6    interplays in the case.

7            And I also just have to say, this is kind of

8    embarrassing on my part, but it's the truth, and it informs

9    why I did what I did in this case.  I come from a different

10   jurisdiction in New York where it's done the opposite way.

11           So I just recently moved to Colorado two years ago.

12   All of the federal cases I've done in New York, 1983 cases,

13   any civil case I've done in New York, it goes like this.

14   Fact discovery goes first, all the depositions, all the

15   reports, that's all done.  After that, there is a period in

16   which expert discovery gets done and it makes more sense to

17   me, maybe it doesn't make sense to you, whatever.

18           THE COURT:  No, no.  I mean, we -- I don't know if

19   you had any role in fashioning the scheduling order, but if

20   that's what the parties have asked for in the scheduling

21   order, that's what I give them.

22           MR. FISHER:  Yeah.  So I initially sent a draft to

23   Mr. Ziporin that called for fact discovery to be done by a

24   certain date and then another three months for expert

25   discovery.  He sort of wrote back and made changes, and I

1     just thought, Okay, this is the way they do it here.

2          What I mistakenly thought, honestly -- again, it's

3     a little bit embarrassing -- I mistakenly thought the

4     discovery end date was the date that discovery was over for

5     fact and expert witnesses, right.  And I mistakenly thought

6     this expert designation date was the date by which you're

7     supposed to identify who your experts are.

8          I thought we were pushing all back, based on my

9     conversation with Mr. Ziporin, so I thought it didn't really

10    matter, we were going to get a new scheduling order; I

11    wouldn't have to worry about those designations.  But when I

12    got the report and the designations from him, I was confused

13    and saying, Why are they giving me a whole report because

14    this is not what I'm used to?  It's not what I understand the

15    way it's going to work, it doesn't really make sense to me,

16    and then also, I thought we were going to push everything

17    back.  So that's just a more full understanding of where I

18    came from.

19         I'm not trying to do any kind of surprise or

20    unnecessary delay or try to make it so I get the road map of

21    their experts first.  It's not what I'm doing at all.  In

22    fact, if Your Honor wanted to set a new schedule where my

23    expert disclosures were due two weeks before theirs to give

24    them a jump start, like I had, I have no problem with that.

25    I also have no problem with identifying exactly who my

1   experts are by Friday, giving their CVs, their prior trial

2   testimony and all that.

3          I'm just concerned with prejudicing my client to

4   such an effect where we can't prove his case because of the

5   mistake that I made.  I mean, I would advise him if we got

6   precluded from calling experts to hire a new lawyer and ask

7   for a new schedule because I messed up his case so badly that

8   he wouldn't want to proceed with me.

9          THE COURT:  Okay.

10         MR. FISHER:  So I just don't want to go down that

11  road.  And I think that will way further delay the case as

12  well.

13         THE COURT:  Understood.

14         Well, you've got to admit you don't often see

15  someone fall on their sword like that and a mistake was made.

16  I'm going to accept your explanation on the New York part

17  because that's understandable.  I'm going to have to give

18  them their costs, their fees for today, because this is

19  unnecessary, based on your lack of timing.

20         So I'll let you designate by the next Friday.  Can

21  you do full designations by that time?

22         MR. FISHER:  Not in terms of reports, not in terms

23  of expert reports.  That I would need a couple months.  And

24  part of the problem also is the fact that my client lives in

25  Idaho and so getting him to actually physically be in the

1      same room with some of the experts is difficult and requires

2      a lot of scheduling.

3              THE COURT:  Well, disclose what you can then by --

4      disclose your experts, at least, by the 25th and then all the

5      requirements of the rule -- October 2?  Can you meet that

6      deadline?

7              MR. FISHER:  I think I can try.  It's just that one

8      of the experts I'm contemplating hiring said she would need

9      until the end of October, which would be a full three months

10     extension based on the --

11             THE COURT:  Okay.  I'm going to put October 2.  If

12     you need relief from that, go ahead and submit a motion and

13     show cause, okay.

14             MR. FISHER:  Okay.

15             THE COURT:  Okay.  So I'm going to give you guys

16     another round of designation then by October 31.  When were

17     you all proposing your discovery deadline?

18             MR. ZIPORIN:  We think the one we currently have is

19     10/31 and we were talking about moving it back 90 days.

20             MR. FISHER:  Well, but these extensions may require

21     more than 90 days now, Your Honor.

22             THE COURT:  Really?  So if you designate by end of

23     October, do you think you need more than November and

24     December to do the discovery?  I mean, it's okay if you do.

25             MR. FISHER:  Could we just -- I guess if we went to

1    the end of January 18, that's 90 days.

2              THE COURT:  If you want that.

3              MR. FISHER:  That would be --

4              THE COURT:  All right.  January 31st all discovery.

5    Do I have something -- what do I have right now from you

6    guys?  Do I have any -- do I have medical records?

7              MR. ZIPORIN:  No.  You have reviewed medical

8    records --

9              THE COURT:  I did that.

10             MR. ZIPORIN:  -- and we'll be submitting additional

11   records.

12             THE COURT:  Including the DOJ report?

13             MR. ZIPORIN:  Help me out here, Ryan.  I know we're

14   in the process of preparing for you, I think, some of the

15   professional standards, Internal Affairs investigation

16   information.

17             THE COURT:  Okay.

18             MR. ZIPORIN:  We're going to provide you with a

19   redacted and unredacted set.

20             THE COURT:  And you're relying on deliberative

21   process?

22             MR. ZIPORIN:  No.  That's just the issue of

23   protection of the names of the involved officers.

24             THE COURT:  Okay.

25             MR. ZIPORIN:  And Mr. Fisher's point that he can't

1    develop potentially a pattern if we redact the names and so

2    Your Honor was going to take a look at those.  Deliberative

3    process was solely with regard to the DOJ records.

4              THE COURT:  Okay.

5              MR. ZIPORIN:  And that will be fully briefed by

6    tomorrow is our deadline to file our reply, or is it

7    Thursday?

8              THE COURT:  Okay.

9              MR. McGRATH:  We have three days from yesterday.

10             MR. ZIPORIN:  So I think that would be Thursday,

11   Your Honor.

12             THE COURT:  Yeah.

13             MR. ZIPORIN:  So we'll have that reply -- that will

14   be fully briefed.  And then depending on Your Honor's order,

15   you may request in-camera inspection of those.

16             THE COURT:  Okay, wonderful.

17             MR. ZIPORIN:  Can I ask a quick clarification on

18   the expert issue?

19             THE COURT:  Yes.

20             MR. ZIPORIN:  Our request -- our alternative

21   request, which was to have the Court limit the scope of the

22   experts, given the issues here, has that been denied?

23             THE COURT:  So you want to limit the scope to what

24   your experts opined?

25             MR. ZIPORIN:  Well, my -- our position is that many

1   of these experts that are late could have been designated,

2   obviously, in advance of the deadline.

3          THE COURT:  Right.

4          MR. ZIPORIN:  The only expert that I've heard that

5   Mr. Fisher says doesn't have everything he or she needs is

6   the Monell expert.

7          THE COURT:  Is that -- was that right?

8          MR. FISHER:  Well, also the PTSD and the vocational

9   rehab and the economist, to a lesser extent.

10         THE COURT:  Well, the PTSD, I mean, that's -- you

11  don't need anybody's records, besides your client's records,

12  to determine that one, right?

13         MR. FISHER:  The only thing they said to me, and I

14  don't know if this is 100 percent true, they could certainly

15  do it without, but they also -- they would love to see --

16  they usually see plaintiff's dep before they're going to

17  write a report so they can really understand the depth of

18  what's happened to the person.

19         THE COURT:  And the plaintiff's deposition has been

20  taken?

21         MR. ZIPORIN:  No, but they have full access to

22  interview him, even telephonically.

23         THE COURT:  Yeah.

24         MR. FISHER:  Yeah, that's true, that's true.

25         THE COURT:  I agree in principle with Mr. Ziporin,

1    I mean, some of these experts, you have all the cards, you

2    don't need anybody else, so.

3            MR. FISHER:  This is true.  And again, if I had

4    known that that's what the deadline meant and it wasn't going

5    to get moved back, I certainly would have done these things

6    before; but again, I just didn't -- I didn't understand it,

7    honestly.

8            THE COURT:  Okay.  So --

9            MR. ZIPORIN:  I appreciate the candor here, Your

10   Honor, and I agree, it's not very often that you see someone

11   that takes responsibility like that.  But I don't know if

12   excusable neglect is, I didn't know the rules.  And I don't

13   mean to be harsh here, Your Honor, but that's really what

14   we're hearing here today.

15           THE COURT:  Yeah.  No, you're right.  That's just

16   the deadline was set out in our scheduling order in this

17   case.  What specifically are you asking at the moment?

18           MR. ZIPORIN:  That the only expert that he be

19   permitted to designate out of time would be a Monell expert

20   because that's the only information that he claims he does

21   not have yet that he needs that we would even concede.  We

22   don't think it's going to be relevant at the end of the day,

23   but it could be; that we haven't given him everything

24   pursuant to his discovery request related to the Monell

25   claim, just given the shear volume of the Internal Affairs

1    information.

2              THE COURT:  All right.

3              MR. ZIPORIN:  And everything else he had either

4    access to or already had all the information that he needed

5    in advance of that deadline to designate a use-of-force

6    expert, an economist, a voc rehab, and the PTSD.  Another

7    side issue here, Your Honor, is the scheduling order limits

8    each side to three experts; he's listed four.

9              MR. FISHER:  I actually -- I might be wrong on

10   this, but what I recall is that that's what the defendants

11   wanted and we did not -- that was a disagreement in the

12   order.  I might be wrong about that, but I don't think that's

13   something I agreed to.  I think that they wanted to limit it,

14   but I did not.

15             MR. ZIPORIN:  I read the scheduling order this

16   morning and there doesn't make reference to any dispute on

17   that.  It just says three experts per side.

18             THE COURT:  Yeah.  And my practice is -- well, no.

19   So I rely on the parties to direct me to disagreements if I

20   don't pick up on it myself, which we do sometimes, but if I

21   don't actually address the disagreement, then I rely on the

22   parties.  What the schedule order says is plaintiff doesn't

23   propose limits and you propose three, but there is no

24   decision by me.

25             MR. ZIPORIN:  Then I misspoke.

1           THE COURT:  If I said it from the Bench, I'm going

2     to go back and listen to the tape and see.  Well, defendants

3     will designate one expert each in the fields of police

4     practices and procedures, psychiatrist, psychology, dealing

5     with post-traumatic stress disorder, economist and medical

6     expert.  That's a quote.

7           MR. ZIPORIN:  From defendant?

8           THE COURT:  Yeah.  It says defendants Commerce

9     City, Smith, Diener, and Jenkins.  Defendants will designate

10    one expert each in the fields of police practices and

11    procedures, psychiatrist, psychologist, dealing with

12    post-traumatic stress disorder, economist and medical expert.

13    That's paragraph 9(d)(2).  The plaintiff said, police

14    practices, psychiatric, psychologist, economist, medical

15    expert.  So you both said the same thing.  So given the

16    actual explanation of experts, I would think four is going to

17    be the limit, and those are the four fields.

18          Do you see it?

19          MR. ZIPORIN:  I do, and I just -- that must be New

20    York City attorney's work.  I don't ever want an economist or

21    need one, so the fact that that's in there surprises me, but

22    that's what it says, so that's a nonissue here today.

23          So the other issue would be, you know, unless Your

24    Honor has any more questions, that's how we would request

25    that the expert designation be limited.

1        THE COURT:  I should have done a better job of

2   putting -- I usually put in bold what the Court has to say,

3   what I have to say about any disagreement and I didn't do

4   that here.  But again, I'll -- just to check myself, I'll go

5   back and listen to the tape.  But I'll let -- I'll let

6   experts in those four fields.

7        MR. FISHER:  I'm sorry.  As we're sitting here and

8   talking, I just realized that I did not mention that I also

9   want to designate an ortho, which is to deal with the

10  plaintiff's finger.

11       THE COURT:  Well, you said medical expert.

12       MR. FISHER:  Yeah, that's what I thought would be

13  encompassed.  And then I just realized I didn't say that out

14  loud when I said who my experts are going to be.

15       THE COURT:  Four.  I mean, you get four only --

16       MR. FISHER:  Okay.

17       THE COURT:  -- one way or the other.

18       You know, if it was farther down the road, this

19  would be a completely different story.  I can just envision

20  what a Tenth Circuit might say about they reraised the issue

21  within five days of the actual deadline.  Technically, blew

22  the deadline, no doubt about that, and there ought to be a

23  penalty for that.  And we're here today in most part because

24  of that issue so that's why you all get your fees for today.

25       But I think the prejudice to the plaintiff in not

1   being able to present his case versus what I view as maybe

2   minimal prejudice to the defendants, I've got to accommodate

3   the plaintiff, but you've just used your one mulligan

4   regarding New York because you're not in New York anymore.

5          Are we -- are we okay on deadlines?

6          MR. HAINES:  Actually, Your Honor, if I could ask a

7   clarifying question?

8          THE COURT:  Yes, you may.

9          MR. HAINES:  If initial expert disclosures are

10  pushed back the second week to October 2 for plaintiff and

11  October 31 for defendants to supplement, we probably ought

12  to --

13         THE COURT:  Well, that's also going to be your

14  rebuttal.  So you're going to have to do your affirmative and

15  your rebuttal at the same time, okay.

16         MR. HAINES:  Okay.  That's just the report, right?

17         THE COURT:  Yeah.

18         MR. ZIPORIN:  My rebuttal reports?

19         THE COURT:  The reports that can rebut their expert

20  reports, which they've already designated as affirmative

21  experts.

22         MR. ZIPORIN:  So both their -- I'm sorry, Patrick.

23         MR. HAINES:  No, that's -- you anticipated my first

24  question, which was --

25         THE COURT:  He gets just one round, then you guys

1    get two now.

2              MR. HAINES:  Okay.  So that's -- the 31st then is

3    our supplemental/rebuttal?

4              THE COURT:  Yes.

5              MR. HAINES:  To the extent we want to add another

6    expert.

7              THE COURT:  Yes.

8              UNIDENTIFIED SPEAKER:  Based on what I've

9    designated (inaudible) report.

10             THE COURT:  Yes.  Well, yes, up to four total.

11             MR. HAINES:  Thank you, Your Honor.

12             MR. ZIPORIN:  The only deadline I saw is still

13   missing, Your Honor, was the dispositive motion deadline.  We

14   got as far as discovery, January 31, so we just ask for 30

15   days.

16             THE COURT:  Which would take us to February -- or

17   excuse me, March 2.

18             MR. ZIPORIN:  And I hope my last question for

19   clarification, Your Honor.  The fees that are awarded for

20   today, would that include preparation time, travel cost and

21   attendance here?

22             THE COURT:  Yes.

23             MR. ZIPORIN:  Thank you.

24             MR. FISHER:  And, Judge, I have one clarification

25   question.  I think it's more for the defense actually, but I

1   see so far they've only rendered one report, which is from

2   the police practices' expert.  So are you all expecting me to

3   have a rebuttal report --

4           THE COURT:  Well, no.  Did you designate two but

5   just do one report?

6           MR. ZIPORIN:  Yeah, because we don't have the

7   medical records that Your Honor ordered be produced.

8           THE COURT:  Okay.

9           MR. ZIPORIN:  And so when we get those, you know,

10  we should be able to turn something around pretty quickly.

11          THE COURT:  Okay.  Then when will those be

12  produced?

13          MR. ZIPORIN:  That's a question for Mr. Fisher.

14          MR. FISHER:  Which records are you still missing?

15          MR. ZIPORIN:  We're missing his historical diabetes

16  records.

17          MR. FISHER:  I see.  So we have releases out to

18  those doctors but we haven't gotten it back yet.

19          THE COURT:  Will you follow up with that?

20          MR. FISHER:  Yes.

21          THE COURT:  Had I already set a final pretrial

22  conference?  Yeah, January 29.  So we need to take -- I just

23  said March 2 for the --

24          MR. ZIPORIN:  Dispositive motion.

25          THE COURT:  -- dispositive motion, so we need to go

1      out to May for that.  May Day.

2              MR. FISHER:  I'm not sure what date that is.

3              THE COURT:  I think it's May 1.  Am I right?

4              MR. ZIPORIN:  I don't know either.

5              THE COURT:  You never heard of May Day?

6              MR. FISHER:  I've heard of it, but I'm not

7      positive.

8              THE COURT:  Am I that old?  May.

9              MR. ZIPORIN:  May 1 works.  Does that work for you,

10     Ryan?

11             MR. McGRATH:  May 1.

12             THE COURT:  May Day wikipedia.

13             UNIDENTIFIED SPEAKER:  An ancient northern

14     hemisphere spring festival.

15             THE COURT:  A public holiday usually celebrated on

16     May 1, ancient northern hemisphere spring festival.

17             UNIDENTIFIED SPEAKER:  Will Your Honor have the May

18     pole in the courtroom?

19             THE COURT:  No, but you can bring one if you want

20     as a prop.

21             UNIDENTIFIED SPEAKER:  I don't know if they will

22     let me pass security.

23             UNIDENTIFIED SPEAKER:  That's fine with us as well,

24     Your Honor.

25             THE COURT:  All right, very good.  Did I say a

1    time?

2              MR. ZIPORIN:  No.  I was going to ask, is there a

3    time?

4              THE COURT:  May 1 at 10:00, although I know I'm

5    attending a graduation.  Wait a second, let me -- hold on,

6    let me look at something here.  Okay.  Anything else we can

7    do today?

8              MR. FISHER:  I don't believe so, Your Honor.

9              THE COURT:  So don't let things drift as far as

10   records, whenever, call some kind of an informal conference.

11   I want to keep these deadlines.  I try to pride myself in

12   getting cases to trial within 20 months or so, 24 months, but

13   each case deserves its own consideration so I don't -- it's

14   not a cookie-cutter sort of a deal, just a presumption.

15             (Whereupon, the within hearing was then in

16   conclusion at 11:51 a.m.)

17

18

19   I certify that the foregoing is a correct transcript to the

20   best of my ability to hear and understand the audio recording

21   and based on the quality of the audio recording from the

22   above-entitled matter.

23

24   /s/ Dyann Labo                      March 6, 2018

25   Signature of Transcriber            Date